UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

GLEN ELECTRIC HOLDINGS GmbH,  )
et al.,            )
              )
       Plaintiffs,  )  Case No. 1:10-cv-1109
              )
v.             )  Honorable Joseph G. Scoville
              )
COOLANT CHILLERS, INC. (now known )
as Fluid Chillers, Inc.), et al.,   )
              )  __OPINION__
       Defendants.  )
_____)

    This is an action for infringement of a registered trademark under the Lanham Act, 15 U.S.C. § 1114(1)(a), and for unfair competition and dilution, 15 U.S.C. §§ 1125(a), (c). Subject-matter jurisdiction is founded on 28 U.S.C. § 1338. In addition, the parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000.00. 28 U.S.C. § 1332(a). Plaintiffs allege that they are the owners of the registered trademark "KK Koolant Koolers" and that defendants have infringed the trademark by their use of the name "Coolant Chillers" in interstate commerce. The parties have agreed to the dispositive jurisdiction of a magistrate judge under 28 U.S.C. § 636(c).

    Presently pending before the court is plaintiffs' motion to enforce an alleged settlement agreement. Plaintiffs assert that the parties reached a binding settlement at the end of a day-long mediation session conducted on February 14, 2013, pursuant to this court's Local Civil Rule on voluntary facilitative mediation. W.D. MICH. LCIVR 16.3. Defendants assert that no

meeting of the minds was reached as a result of the mediation.  Alternatively, they argue that any agreement reached is unenforceable, either because there was a failure of a condition precedent or because of frustration of purpose.

The court conducted an evidentiary hearing on May 20, 2013.  Plaintiffs presented the testimony of Robb Krueger (plaintiffs' trial counsel) and Ola Wettergren (President of plaintiff Dimplex Thermal Solutions), both of whom were present at the mediation.  Defendants presented the testimony of Timothy Ayres and Thomas Ayres, who were also present at the mediation.  They did not call attorney Peter Dewhirst, who represented defendants at the mediation and drafted documents memorializing the settlement terms.  On the basis of the evidence presented by the parties, the court finds that plaintiffs and defendants reached an enforceable settlement agreement at the conclusion of the mediation session on February 14, 2013, and that defendants' arguments are insubstantial.  Judgment will therefore be entered on behalf of plaintiffs.

## Findings of Fact

A.    **Parties and Claims**

1.    Plaintiff Glen Electric Holdings GmbH is a German limited liability company. Plaintiff Dimplex Thermal Solutions, Inc., a Delaware corporation, is a wholly owned subsidiary of Glen Electric.

2.    Plaintiffs claim to be the owners of a federally registered trademark for the brand "KK Koolant Koolers."

3. Defendant Timothy R. Ayres was employed by plaintiffs' predecessor in interest between 1998 and 2004. After this employment, defendant Ayres formed a company for the sale of commercial chillers, defendant Coolant Chillers, Inc.

4. By complaint filed November 10, 2010, plaintiffs alleged that defendants' use of the name Coolant Chillers, Inc. constituted an intentional infringement of plaintiffs' mark and created a likelihood of confusion in the marketplace.

5. On January 11, 2011, a default was entered as to defendant Coolant Chillers, Inc. for failure to plead. Thereafter, Chief Judge Paul Maloney denied a motion to set aside the default and denied a motion for reconsideration.

6. In connection with a Rule 16 scheduling conference, all parties consented to the dispositive jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (*See* Joint Status Report, ¶ 5, docket # 31, and Consent and Order of Reference, docket # 32).

7. The court conducted a telephonic scheduling conference on January 9, 2013. At that conference, counsel informed the court that they had agreed to submit this matter to voluntary facilitative mediation before retired Circuit Judge Philip D. Schaefer, within the next thirty days. On that basis, the court continued the telephone scheduling conference to a later date, pending the mediation.

8. The parties and their counsel met in Kalamazoo, Michigan, on February 14, 2013, for a mediation session with retired Judge Schaefer. Plaintiffs were represented by attorney Robb Krueger, who was accompanied by client representative Ola Wettergren, President of plaintiff Dimplex Thermal Solutions. Defendants were represented by attorney Peter Dewhirst, accompanied by defendant Timothy Ayres, President of defendant Coolant Chillers, Inc. Thomas Ayres, the

-3-

manufacturing manager for Coolant Chillers, Inc., was also present.  The mediation session began at about 10:00 a.m. and concluded at approximately 6:30 p.m.

9.     The mediation focused on two principal issues:  (1) the amount of settlement payment to be made by defendants to plaintiffs and (2) the change of corporate name of defendant Coolant Chillers, Inc. to a different name, one that plaintiffs would not challenge as infringing their registered trademark.  Numerous offers and counter-proposals were discussed by the parties.  At one point in the negotiation, plaintiffs offered to accept an immediate payment of $40,000.00 if Coolant Chillers, Inc. would change its name to a name that did not include the words "cool," "cooling," or "chillers."  Defendants rejected this offer.

10.     Toward the end of the mediation session, the parties came to an agreement to settle this litigation.  Although retired Judge Schaefer had spent much of the mediation session in private caucus with one party or another, he brought all parties and attorneys together at the end of the session to confirm the terms of settlement.  The settlement included, among other terms, the agreement of defendants to change the name of Coolant Chillers, Inc. to U.S. Cooling Chillers, Inc. and a total payment to plaintiffs of $105,000.00.  Plaintiffs' representatives expressed their willingness to entertain a different corporate name, if U.S. Cooling Chillers, Inc. proved unavailable.

11.     Because of the lateness of the hour, the parties were not able to use the services of a court reporter to memorialize the settlement.  Instead, plaintiffs' counsel Krueger asked defense counsel, Peter Dewhirst, to send a confirmatory e-mail in the morning.

12.     At 11:15 a.m. on the morning of Friday, February 15, 2013, Mr. Dewhirst sent Mr. Krueger a confirmatory e-mail, as had been agreed the evening before.  The e-mail (Plf. Ex. 1)

indicated that the federal lawsuit had been resolved.  The e-mail then set forth ten terms of settlement, including the following:

- Coolant Chillers, Inc. will change its name to U.S. Cooling Chillers, Inc. and remain a Michigan corporation, within thirty days.

- Within 120 days, defendants would exhaust all their supplies and stock using the name Coolant Chillers, after which it would stop using that name.  The words "coolant" and "chillers," being descriptive, would nevertheless be allowed for use on defendants' website and promotional materials as descriptive terms, but not as a business name.

- Defendants would pay the total sum of $105,000.00 to plaintiffs in accordance with an installment schedule set out in the e-mail.  Defendant Ayres would be personally liable on the initial $40,000.00 amount due, but not for any further amounts.

- The parties agreed to the entry of judgment against defendants in the event of a default, the forum for the judgment being the U.S. District Court for the Western District of Michigan.

13.  In the early afternoon of the same day, Mr. Krueger responded to the Dewhirst e-mail, making several minor suggestions for language changes and raising questions concerning the mechanism for entry of the consent judgment in the event of default, but affirming the material terms of settlement.  (Plf. Ex. 2).

14.  On the basis of the February 15, 2013 exchange of e-mails between counsel (Plf. Exs. 1, 2), the court finds as a fact that plaintiffs and defendants reached a final and binding

agreement to settle this lawsuit at the mediation in accordance with the terms set forth in those e-mails.

15.     On February 22, 2013, the court conducted an off-the-record telephone status conference with counsel for both parties. (Minutes, docket # 35). Counsel for both parties informed the court that the matter had been settled. The court provided guidance concerning the mechanism for proper retention of jurisdiction to enter a judgment in case of default. Beyond that, counsel did not inform the court of any of the terms of settlement. Counsel agreed to submit a stipulation and proposed order of dismissal within fourteen days.

16.     In accordance with his undertaking to do so in the February 15, 2013 e-mail, Mr. Dewhirst set about the task of drafting a formal settlement agreement memorializing the terms of settlement. Mr. Dewhirst drafted a "Settlement Agreement and Mutual Release" between defendant Coolant Chillers, Inc. and Timothy Ayres on one hand and plaintiffs Glen Electric Holdings and Dimplex Thermal Solutions on the other. The Settlement Agreement and Mutual Release (Plf. Ex. 5) set forth settlement terms completely consistent with the terms contained in Mr. Dewhirst's e-mail of February 15, 2013. The document contained no "fall-back" option for defendants, nor did it recite that the settlement was subject to any condition precedent. The Settlement Agreement and Mutual Release contained an integration clause reciting that the agreement embodied the entire agreement and understanding of the parties and that no other promises, representations, warranties, covenants, conditions, or undertakings existed between the parties. (¶  5). Mr. Dewhirst transmitted the settlement agreement and mutual release to Mr. Krueger on Thursday, March 7, 2013, by e-mail sent at 11:08 a.m.

17.    Unknown to any of the attorneys, at 8:43 in the morning of the same day, defendant Timothy Ayres sent Mr. Wettergren an e-mail proposing a different settlement.  (Plf. Ex. 4).  The e-mail informed Mr. Wettergren that defendants' research showed that there were "too many companies with similar or in a couple cases the same name" as the name chosen by defendants in the settlement -- U.S. Cooling Chillers, Inc.  Mr. Ayres said that he would "like to" change the corporate name to "Fluid Chillers, Incorporated."  "We would then like to accept the $40k offer if that is possible."  He offered to pay the $40,000.00 amount in one lump sum, within thirty days.  Mr. Ayres asked Mr. Wettergren to let him know what he thought.

18.    Rather than responding to the e-mail, Mr. Wettergren contacted his attorney, Mr. Krueger.  At 11:00 a.m. on March 7, 2013, Mr. Krueger sent Mr. Dewhirst an e-mail, informing him that Mr. Ayres wanted to "substantively change the provisions of our agreed mediation settlement and go back to an offer which is no longer available."  Mr. Krueger indicated that the corporate name now preferred by defendants (Fluid Chillers Incorporated) was "fine" but that the payment terms would remain the same.  "We are not re-opening negotiations and I consider the matter settled on the terms we set forth at the mediation and in our e-mails."  (Plf. Ex. 5).  In response, Mr. Dewhirst sent Mr. Krueger the Settlement Agreement and Mutual Release described above, indicating that he was "still in discussion with my client about executing it as it is."  With regard to the new proposal by Mr. Ayres, Mr. Dewhirst's e-mail stated, "I did not know about the name change.  I will talk to them."

19.    Thereafter, plaintiffs' counsel provided a mark-up version of the settlement agreement and mutual release, making only editorial changes.  (Plf. Ex. 6).

20.     On March 13, 2013, Mr. Dewhirst sent plaintiffs' counsel a letter by regular and electronic mail.  (Plf. Ex. 9).  The letter stated that defendants "had every intention of changing their name to U.S. Cooling Chillers, Inc." but that they encountered difficulty because of similar sounding names used by competitors.  The letter also stated, "My client fully intended to pay $105,000.00 to your client pursuant to the agreement entered."  The letter recited that midway through the mediation, two options were on the table:  (1) $125,000 payment plus a name change or (2) $40,000 payment plus a name change that would not include any derivation of the word "cool" or "kool."  Because defendants intended not to use "cool" or "kool" in their name, but intended to change their name to Fluid Chillers Incorporated, Mr. Dewhirst asked that plaintiffs' counsel "revisit this issue with your client once again," as such a settlement had been acceptable to plaintiffs at some point during the mediation.

21.     Plaintiffs steadfastly refused to modify the agreement reached at the conclusion of mediation.  On March 29, 2013, plaintiffs filed a motion to enforce the settlement agreement (docket # 36) seeking to enforce the agreement as embodied in Mr. Dewhirst's February 15, 2013 e-mail and subsequent draft Settlement Agreement and Mutual Release.

22.     While the motion was pending before the court, Mr. Ayres sent Mr. Wettergren an e-mail.  (Plf. Ex. 16, dated 4/17/2013).  In this e-mail, Mr. Ayres contended, for the first time, that "we had come up with two settlement agreements."  The e-mail asserted that plaintiffs had given defendants the option of paying $40,000 and changing their name to one that did not include the words "cool" or "kool" or paying $105,000 to change their name to U.S. Cooling Chillers, Inc.  The e-mail went on to discuss the history of dealings between the parties, in an effort to persuade Mr. Wettergren to change his mind.

23.     Mr. Ayres testified at the evidentiary hearing that he believed that he had two options, consistent with his e-mail of April 19, 2013.  The court finds the testimony to be incredible on its face and an afterthought position formulated only after Mr. Ayres realized that he had chosen a corporate name that he could not live with.  There are many reasons to discount Mr. Ayres' credibility, but the principal reason is that his litigation position is completely contrary to the written memorial of the terms of settlement set forth by his own attorney the morning after the mediation session.

24.     In an effort to make his position appear reasonable, defendant Timothy Ayres testified that he agreed to change the corporate name to U.S. Cooling Chillers, Inc. at the February 14, 2013 mediation without any opportunity to perform "due diligence" concerning the availability of that name.  Cross-examination showed this testimony to be a fabrication.  Mr. Ayres had been researching that very name for over a month before the mediation.  On January 3, 2013, Mr. Ayres registered the Internet domain name "Cooling-Chillers.org."  (Plf. Exs. 12, 13).  The assertion that defendants were stampeded at the mediation into agreeing to a name with  no opportunity to research its suitability is an incredible afterthought litigation position, ungrounded in fact.  Furthermore, plaintiffs expressed a willingness, both at and after the mediation, to consider other names if U.S. Cooling Chillers proved unavailable.  The validity of settlement was not subject to any condition precedent that allowed defendants to back out if they decided that the chosen name was not suitable after all.

## Discussion

I.    **Threshold Issues**

    A.    <u>Jurisdiction</u>

The Sixth Circuit Court of Appeals has long held that the federal district courts have inherent power to enforce agreements entered into in settlement of litigation pending before them. *See, e.g., Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992); *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988).  The Supreme Court has held, however, that once a case has been dismissed, the district court requires an independent source of jurisdiction in order to enforce a settlement agreement.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).  Such jurisdiction can be provided by the existence of diversity of citizenship and the requisite amount in controversy or by the express retention in the order of dismissal of jurisdiction to enforce the settlement agreement.  *Kokkonen*, 511 U.S. at 381; *see RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 641 (6th Cir. 2001).  In the present case, however, no order of dismissal has ever been entered.  Rather, plaintiffs have moved for enforcement of the settlement agreement during the pendency of the principal case before the court.  The rule set forth in *Kokkonen*, therefore, has no application to this case, and the court has clear authority to enforce the settlement under Sixth Circuit authority.[1]  *See Limbright v. Hofmeister*, 566 F.3d 672, 674-75 (6th Cir. 2009) (a district court may, on motion by a party and without the filing of a new suit, summarily enforce a settlement agreement if the court has ancillary jurisdiction over the breached claim).

---

[1] If an independent basis for jurisdiction were needed, complete diversity of citizenship and the requisite amount in controversy exist, thus creating jurisdiction under 28 U.S.C. § 1332(a).  *See Colyer v. Travelers Ins. Co.*, No. 12-6018, 2013 WL 1811755, at * 4 (6th Cir. Apr. 30, 2013).

-10-

B. Rule 408

Both parties have expressed concern that Rule 408 of the Federal Rules of Evidence would preclude consideration of the negotiations leading up to the settlement agreement. Rule 408, however, does not sweep that widely. Rule 408 excludes evidence of matters pertaining to settlement negotiations, but only when that evidence is offered "to prove or disprove the validity or amount of a disputed claim." FED. R. EVID. 408(a). The rule expressly allows admission of such evidence for any other valid purpose. *Id.* at 408(b). In the present case, the negotiations leading up to settlement were not offered to prove or undermine the validity of plaintiffs' underlying Lanham Act claims against defendants. Rather, the evidence was offered to prove the existence and terms of the settlement agreement itself. In such circumstances, Rule 408 plainly does not apply. *See Basha v. Mitsubishi Motor Credit of Am., Inc.*, 336 F.3d 451, 454 n.4 (5th Cir. 2003); *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987); *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 691 (7th Cir. 1985); *accord* 2 WEINSTEIN'S FEDERAL EVIDENCE ¶ 408.03[6] at 408-15 (2d ed. 2013) ("If the compromise results in an enforceable contract -- a novation or an accord -- that is subsequently repudiated, the aggrieved party may sue in contract to prove the offer of compromise, its acceptance, and the surrounding circumstances.").

II.     **Existence and Terms of Settlement Agreement**

Agreements settling litigation are "solemn undertakings." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). When asked to enforce a settlement agreement, the district court must first conclude that the parties have reached an agreement on all material terms. *Brock v. Scheuner Corp.*, 841 F.2d at 154. In approaching this task, the court is to apply the general

-11-

contract law of the state in which the agreement was allegedly reached. *Cogent Solutions Group, LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013). Although the district court has authority to enforce a settlement agreement summarily, ordinarily the court must hold an evidentiary hearing where the facts material to an agreement are disputed. *See Kukla v. Nat'l Distillers Prods. Co.*, 483 F.2d 619, 621-22 (6th Cir. 1973); *accord Bamerilease Capital Corp.*, 958 F.2d at 153. The district court's power to summarily enforce settlements extends to cases where the parties' agreements are not in writing and even to those settlement agreements made off-the-record, outside the presence of the court. *Bowater N. Am. Corp. v. Murray Mach., Inc.*, 773 F.3d 71, 76-77 (6th Cir. 1985). In other words, the existence of a valid settlement agreement "is not diminished by the fact that the parties have yet to memorialize the agreement." *RE/MAX Int'l, Inc.*, 271 F.3d at 646.

The proofs presented at the evidentiary hearing established beyond any reasonable doubt that the parties reached a full and binding oral settlement at the February 14, 2013 mediation session. The fact of a settlement was confirmed by exchange of e-mails between counsel for both sides. (Plf. Exs. 1, 2) on the day following the mediation. These e-mails establish the material terms of settlement, as agreed to at the mediation. Counsel informed the court of the fact of settlement one week later, with no hint of any contingency. To accept defendants' present position -- that no meeting of the minds was reached or that the agreement allowed defendants to accept one of two options -- the court would be required to conclude that Mr. Dewhirst inaccurately reflected the terms of settlement, completely contrary to his client's interests. Also incredible, on the present record, is defendants' assertion that the agreement was subject to an unstated condition precedent, under which defendants could repudiate the settlement if the precise name U.S. Cooling Chillers, Inc. proved to be unavailable. Mr. Dewhirst never took the witness stand, and the record is therefore

devoid of any explanation as to how a competent attorney could have completely mischaracterized both the fact and the terms of a settlement agreement in an e-mail (Plf. Ex. 1) and then three weeks later in a draft Settlement Agreement and Mutual Release (Plf. Ex. 5).  If the settlement truly contained a "fall-back position" to $40,000, or an important condition precedent, an attorney attempting to memorialize these terms for his client's benefit would have surely reflected them in the confirmatory e-mail.

The most compelling evidence against defendants, then, is the memorialization of the settlement agreement by their own attorney, made virtually contemporaneously with the settlement. From the time of Mr. Dewhirst's first e-mail on February 15, 2013, until March 7, 2013, three weeks later, no one on the defense side stated or implied that a binding agreement had not been reached or that the agreement was something different from that set forth in the Dewhirst e-mail (Plf. Ex. 1).

The first indication of any disagreement was the e-mail sent by Mr. Ayres to Mr. Wettergren (Plf. Ex. 4), which was obviously done by Ayres without the knowledge of his attorney. On its face, the Ayres e-mail does not contend that the parties had agreed to some sort of fall-back option.  Rather, the e-mail itself is couched as an attempt to change the deal:  "We would like then to accept the $40k offer if that is possible."  When plaintiffs' counsel informed Mr. Dewhirst of Mr. Ayres' proposal, Mr. Dewhirst frankly stated that he "did not know about the name change.  I will talk to them."  (Plf. Ex. 5).  Had the oral agreement reached at the end of the mediation truly contained two options -- a name change to U.S. Cooling Chillers, Inc. and a $105,000.00 payment OR the use of some other name and only a $40,000.00 payment -- Mr. Dewhirst would have certainly reflected that fact in his response.  It would have been a simple matter for him to say that his client was merely exercising the second option agreed to at the mediation.  When Mr. Dewhirst finally

-13-

addressed his client's new position, he did not assert that the parties had agreed to two alternative options.  Rather, he reminded plaintiffs' counsel that two options had been on the table midway through the mediation and asked that Mr. Krueger "revisit" the issue with his clients.  (E-mail of 3/13/2013, Plf. Ex. 9).

The only evidence supporting defendants' contention that the parties agreed to two options is the testimony of defendant Timothy Ayres, corroborated by the brief testimony of his brother.  The court finds defendants' testimony to be internally inconsistent, contrary to all the other evidence in the case, and therefore unworthy of belief.  The only way that defendants could have overcome the devastating effect of Mr. Dewhirst's own memorialization of the settlement terms (Plf. Exs. 1, 5) would have been to present his testimony in an effort to explain how he could possibly have written those documents if the true terms of settlement had been as Mr. Ayres now contends. In the absence of such testimony, the trier of fact may reasonably presume that the testimony, if produced, would not be favorable to defendants' present position.  *See, e.g., Graves v. United States*, 150 U.S. 118, 121 (1893); *accord Interstate Circuit, Inc. v. Paramount Pictures Dist. Co.*, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse."); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 81-82 (2d Cir. 2000).  Mr. Dewhirst would have faced a monumental task in persuading the court that the true agreement was something other than that memorialized in his e-mail and subsequent draft Settlement Agreement and Mutual Release.  In the absence of explanatory testimony, the documents that Mr. Dewhirst drafted as a memorial of the terms of settlement doom his client's present position.

-14-

In addition to being factually unsupportable, defendants' position is contrary to law. Michigan follows an objective standard of contract formation. "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian v. Domino's Pizza, LLC*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006). The question of when and where the parties became contractually bound depends on their intention as manifested by their verbal statements and conduct in light of all the circumstances. *Remark, LLC v. Adell Broad.*, 817 F. Supp. 2d 990, 1002 (E.D. Mich. 2011) (applying Michigan law). An objective view of the evidence shows that the parties had a meeting of the minds on all material terms of the settlement agreement at the conclusion of the mediation session on February 14, 2013. Therefore, it is of no moment that Mr. Ayres never agreed to or signed Plf. Ex. 5, the written embodiment of the settlement terms. There is no requirement that a settlement agreement be reduced to writing to be enforceable. *Remark*, 817 F. Supp. 2d at 1003-04; *accord Kukla*, 483 F.2d at 621. The district court may enforce a settlement agreement even where the agreement has not been reduced to writing nor arrived at in the presence of the court. "The existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When parties have agreed on the essential terms of the settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *RE/MAX Int'l*, 271 F.3d at 646.[2]

---

[2] Additionally, Mr. Dewhirst, as counsel for defendants, was clothed with apparent authority to settle the case, even without his client's express consent. *Capital Dredge & Dock Corp. v. City of Detroit*, 800 F.2d 525, 530-31 (6th Cir. 1986) (applying Michigan law); *Nelson v. Consumers Power Co.*, 497 N.W.2d 205, 208-09 (Mich. Ct. App. 1993). Therefore, the exchange of e-mails between counsel, standing alone, would be sufficient to create a binding agreement, even if the parties had not orally agreed at the mediation. *See Kloian*, 733 N.W.2d at 770-71 (exchange of e-mails between counsel created binding settlement). But they did.

-15-

Michigan law does not allow a party to return to a former, rejected offer and accept it retroactively. Although plaintiffs may well have offered the "$40,000 option" at some point during the mediation, the evidence clearly establishes that defendants did not then accept the offer. Mere discussions in negotiations do not create a binding contract. *See Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992). When defendants responded to the $40,000 option with a counterproposal, the counterproposal operated as a rejection of the original offer. *See Butler v. Foley*, 179 N.W. 34, 36 (Mich. 1920); *Myers v. Jarnac*, 474 N.W.2d 302, 304 (Mich. Ct. App. 1991).

Therefore, the court rejects defendants' position on both the facts and the law. With regard to an alleged condition precedent to the enforceability of the settlement agreement, the court finds that no such condition existed. If the parties had contemplated a condition precedent, defendants' attorney would have reflected it in his contemporaneous e-mail or in the draft settlement agreement that he prepared to memorialize the terms of the settlement. The first time that an alleged condition precedent was ever asserted was in defendants' brief in opposition to plaintiffs' motion to enforce the settlement. Likewise, there is no credible evidence that the parties agreed to two separate options, pursuant to which defendants could change the corporate name to something far removed from Koolant Koolers and make only a $40,000 payment. Although this offer was on the table at one point during the negotiations, defendants rejected it, and the parties ultimately settled on the terms set forth in Mr. Dewhirst's e-mail. (Plf. Ex. 1).

Finally, defendants cannot take refuge in the doctrine of frustration of purpose. This doctrine, which is not well-developed in Michigan law, applies where "'a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the

-16-

contract.'" *Liggett Rest. Group, Inc. v. City of Pontiac*, 676 N.W.2d 633, 637 (Mich. Ct. App. 2003) (quoting RESTATEMENT CONTRACTS (2d) § 265, comment (a)). The frustration must be so severe that it is not fairly to be regarded as within the risks assumed under the contract, and the nonoccurrence of the frustrating event must have been "a basic assumption on which the contract was made." *Liggett Rest. Group*, 676 N.W.2d at 637; *accord City of Flint v. Chrisdom Prop., Ltd.*, 770 N.W.2d 888, 891 (Mich. Ct. App. 2009). Defendants cannot possibly wedge this case within this narrow doctrine. No change in circumstances made the settlement "virtually worthless" to defendants. The value of the settlement from defendants' point of view was to save the cost of litigation and the possibility of a large verdict against them. In exchange, defendants agreed to pay money and to change the corporate name to one that was not objectionable to plaintiffs. When defendants decided that they did not want to use the agreed-upon name and proposed the name Fluid Chillers, Inc. as an alternative, plaintiffs agreed instantly. Therefore, defendants preserved the benefit of the bargain, although with a name that was perhaps somewhat less attractive to them. Furthermore, the so-called "frustrating event" did not involve a basic assumption on which the contract was made. To the contrary, all witnesses agreed that plaintiffs committed to be flexible in case defendants needed to deviate from the contractually chosen name for some reason. Had plaintiffs reneged on this promise, leaving defendants with no option but to accept a worthless corporate name, the situation might have been different. Plaintiffs, however, did not renege, leaving defendants free to choose another acceptable corporate name, which they did.

Plaintiffs have met their burden of establishing a binding settlement agreement, and defendants' arguments are wholly insubstantial. A judgment will therefore be entered enforcing the

settlement agreement according to the terms memorialized contemporaneously by defendants' own attorney.

### III.    Remedy

As noted, the settlement agreement contains both monetary and non-monetary features.  With regard to the payment of money, defendants agreed to pay plaintiffs the total sum of $105,000, with installment payment terms.  Defendant Timothy Ayres was to be personally liable only for the initial $40,000.00 due, but not the remainder of the settlement amount.  The parties agreed to a thirty-day cure period, after which a penalty (double the remaining amount due or $30,000.00, whichever is greater) plus attorney's fees would accrue.  The court will therefore enter judgment against both defendants in the amount of $40,000.00 and against defendant Coolant Chillers, Inc. in the additional amount of $65,000.00.  Execution will be stayed for thirty days on the first $20,000.00 and for ninety days on the second $20,000.00.  The $65,000.00 judgment will be subject to an installment payment order under Mich. Ct. R. 3.104.[3]  If defendants fail to comply with the installment order, plaintiffs may move pursuant to Mich. Ct. R. 3.104(C) to set aside the installment order and for the assessment of the agreed-upon penalty and attorney's fees.

In addition to monetary relief, plaintiffs are entitled to injunctive relief enforcing defendants' agreement to cease using the name Coolant Chillers, Inc. as a business name.  At the hearing, defendants asserted the position that their agreement to change the name of the corporate

---

[3] Enforcement of federal judgments is generally subject to the procedures set forth in the law of the state where the district court sits.  FED. R. CIV. P. 69(a)(1).  State law generally requires notice and an opportunity for hearing before the court enters an order for installment payment of a judgment.  MICH. CT. R. 3.104(A), (B).  In the present case, however, the parties clearly agreed to payment of the settlement on an installment basis.  The court's judgment will therefore reflect the clear agreement of the parties.

defendant from Coolant Chillers, Inc. in no way disables them from using that name as part of an Internet website address.  This position, articulated by Mr. Ayres in his testimony, is a further sign of defendants' lack of good faith.  Defense counsel's e-mail memorializing the settlement terms (Plf. Ex. 1) contained this provision concerning the use of the name Coolant Chillers, Inc.:

> The name, being a descriptive term, is allowed to be using [sic] within its website and promotional materials as a descriptive term for its products being sold, but will not be used in the business name.

(Plf. Ex. 1).  The settlement agreement drafted by Mr. Dewhirst expresses the same concept with more clarity and precision:

> The Parties understand and agree that the words "coolant" and "cooler" are descriptive terms and that Coolant Chillers will be permitted to use those terms on its website and its promotional materials as descriptive terms for the products being sold, but not as part of a business name or as a trade name for the company in any electronic or paper material.

(Settlement Agreement and Mutual Release, ¶ 2(B), Plf. Ex. 5).  Defendants thus clearly agreed not only to change the corporate name but also not to use the words coolant or cooler "as part of a business name or as a trade name for the company in any electronic or paper material."

In general, the use of a name in an Internet domain name constitutes a trademark use. *See Interactive Prods. Corp. v. A2Z Mobile Office Solutions*, 326 F.3d 687, 696 (6th Cir. 2003). This is because domain names usually signify source.  *Id.*; *accord Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1177 (9th Cir. 2010).  Defendants promised not to use the words "coolant" or "cooler" as part of a business or trade name.  To insist that this promise allows them to use the name "Coolant Chillers" as a domain name is sophistry.  Defendants' promise to refrain from use

of the words "coolant" and "cooler" as a trade name in "any electronic material" clearly prevents them from use of the words in a domain name.[4]

Plaintiffs introduced evidence that, despite their agreement, defendants persist in using the terms on their website and in domain names (*e.g.*, Plf. Ex. 8).  In his testimony, Timothy Ayres freely admitted using the term as a domain name.  He attempted to explain how the use of these terms in a domain name was not covered by the agreement, but his explanation gives obfuscation a bad name.  Defendants' willingness to take liberties with their agreement is a clear indication that injunctive relief is necessary.

The court will issue an injunction prohibiting defendants from using the name "Coolant Chillers, Inc." as a corporate name and further preventing them from using the terms "coolant" or "cooler" as part of a business or trade name, including in a domain name.  Defendants will be allowed to exhaust their present supplies and stock of the name Coolant Chillers until June 30, 2013 (120 days after April 1, 2013, the last date on which the settlement agreement should have been signed).

---

[4] By contrast, the use of words in a URL address after the domain name is generally not deemed a designation of source.  *Interactive Prods. Corp.*, 326 F.3d at 696-97.  Thus, while use of "Cooling-Chillers.org" would be a breach of the agreement (and injunction), "www.Fluid-Chillers.com/Coolant" would not.

**<u>Conclusion</u>**

For the foregoing reasons, plaintiffs' motion to enforce settlement agreement will be granted and a judgment will be entered in favor of plaintiffs and against defendants as outlined above.


Dated:   May 31, 2013                              /s/  Joseph G. Scoville
                                                               United States Magistrate Judge